FILED
United States Court of Appeals
Tenth Circuit

March 12, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.                                  No. 06-4232

JAMES THOMPSON,

     Defendant-Appellant.

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.                                  No. 06-4256

THOMAS E. MOWER,

     Defendant-Appellant.

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.                                  No. 06-4258

LESLIE D. MOWER,

     Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:02-CR-787-K)**

Scott C. Williams, Salt Lake City, Utah, for Defendant-Appellant, James Thompson.

Max D. Wheeler (Rodney R. Parker and Sam Harkness with him on the briefs), of Snow, Christensen & Martineau, Salt Lake City, Utah, for Defendant-Appellant Thomas E. Mower.

Denver C. Snuffer, Jr. of Nelson, Snuffer, Dahle & Poulsen, P.C., Sandy, Utah, for Defendant-Appellant, Leslie D. Mower.

Gregory Victor Davis, Attorney, Tax Division, United States Department of Justice, Washington, D.C., (Richard T. Morrison, Acting Assistant Attorney General; Alan Hechtkopf, Attorney, Tax Division, United States Department of Justice, Washington, D.C.; and Troy A. Eid, United States Attorney, District of Colorado, Denver, Colorado, of Counsel, with him on the briefs), for Plaintiff-Appellee.

Before **KELLY, McWILLIAMS,** and **BRISCOE,** Circuit Judges.

**BRISCOE,** Circuit Judge.

Defendants Thomas Mower and Leslie Mower appeal their convictions of one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and six counts of tax evasion, in violation of 26 U.S.C. § 7201, for the years 1992 through 1997. Defendant James Thompson appeals his conviction of one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and one count of corruptly endeavoring to interfere with the administration of internal revenue laws, in violation of 26 U.S.C. § 7212(a). Thomas Mower argues that (1) the evidence was insufficient to convict him of tax evasion for the years

2

1992, 1993, and 1997; (2) the district court erred in admitting the government's summary charts; and (3) the district court erred in compelling Thomas Mower's attorney, Allen Davis, to testify before the grand jury. Leslie Mower contends that (1) the evidence was insufficient to convict her of all counts; (2) the district court erred in admitting the government's summary charts; (3) her sentence was procedurally and substantively unreasonable; (4) the district court erred in not giving certain jury instructions; (5) the statute of limitations barred four of the counts of tax evasion, for the years 1992 through 1995; (6) her sentence violated the *ex post facto* clause; and (7) the district court erred in denying her motion for severance. James Thompson argues that (1) the evidence was insufficient to convict him of either count; (2) the statute of limitations barred both counts; and (3) the district court erred in denying his motion for severance. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

I.

On December 19, 2002, Thomas Mower and his wife, Leslie Mower, were indicted on one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and six counts of tax evasion, in violation of 26 U.S.C. § 7201, for the tax years 1992 through 1997. On April 8, 2003, the grand jury returned a Superseding Indictment, adding charges against James Thompson for one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and one count of corruptly endeavoring to interfere with the administration of internal

3

revenue laws, in violation of 26 U.S.C. § 7212(a).

Defendants Thomas and Leslie Mower owned three corporations—Neways US, Neways Australia, and Neways Malaysia[1]—each of which utilized a multi-level marketing system to sell a variety of personal care products. In a multi-level marketing system, the company manufactures or purchases product and sells it to distributors, who purchase the product at a discount and make money by selling it to the public at retail price. Distributors receive bonuses by signing up other distributors to sell product. Distributors who have recruited new distributors also receive bonuses as a result of sales by distributors beneath them in the "downline." Individuals at the top of a Neways downline could make between $25,000 and $35,000 per month. The Mowers had a downline in Neways US called "Base of the Tree," and a distributorship in Neways US called "Mower Partnership."

Thomas Mower was the president of Neways US, and he was in charge of running the company—"the go-to person." Neways employees regularly discussed the financial status of the company with him, and he made most of the decisions for Neways US. Randy Lindstrom, a former general manager of Neways US, testified that Thomas Mower had a basic understanding of accounting, as evidenced by their conversations about income and expenses.

---

[1] Neways US is located in Utah and was originally named "Images & Attitudes."

According to Lindstrom, Thomas Mower "didn't like to pay taxes."

Leslie Mower also made decisions on a daily basis for Neways US, although she dealt more with distributors than with sales. In the early 1990s, she had virtually no involvement with the financial side of the business. Later, for a period during the mid-1990s, she became Chief Financial Officer of Neways US,[2] even though she did not have any expertise in accounting or finance, and she had some difficulty understanding the company's financial statements. She would sometimes pay the corporation's bills, but she mostly just promoted the product.

Because of its rapid growth in the early 1990s, Neways US was very heavily indebted to creditors and needed money for operating expenses. The Mowers did not want to borrow working capital from a bank, so they instead tried to solve the company's money problems by bringing in cash from Neways Australia. Thomas Mower began meeting with his attorneys to determine how to get money out of Neways Australia without paying taxes on it. Soon, Neways US began receiving hundreds of thousands of dollars from Neways Australia, which Neways US recorded as pre-payment for product that it later sent to Neways Australia. In addition to these pre-payments, Neways US received other amounts from Neways Australia that it classified as loans.

Neways Australia had two primary bank accounts: an operating account and

_____

[2] The corporation's bylaws did not actually provide for a position called "Chief Financial Officer," but she referred to herself as such.

5

a bonus checking account. It paid for its day-to-day operations—including bills, payments for product, salaries, and royalty payments to Neways US—from its operating account. Every month, it paid distributor bonuses from the bonus checking account. When examined, the books and records at Neways Australia were found to be in poor condition.

At the top of the Neways Australia downline were seven distributorships: Images, Inc. 1 through 7, which later became Neways, Inc. 1 through 7, and then Mower Properties, Inc. 1 through 7.[3] Marija Lee, a former employee at Neways Australia and Neways Malaysia, testified that John Hunter, the then-CEO of Neways Australia, asked her to place these distributorships at the top of the Neways Australia downline. Thomas Mower had originally wanted to set up the Neways Australia downline like the Neways US downline, but John Hunter advised him to create these seven entities to absorb more bonus payments than one entity alone could absorb. These amounts are known in the industry as "breakage." The Neways 1 through 7 distributorships did not have to sell product to receive commissions, and they were structured to absorb any bonuses that would otherwise flow up to the company itself. Mr. Hunter had several

---

[3] Individually, these were: Images, Inc. 1; Images, Inc. 2; Images, Inc. 3; Images, Inc. 4; Images, Inc. 5; Images, Inc. 6; and Images, Inc. 7. When their names later changed to Neways, and then to Mower Properties, they stayed as seven separate entities. We will largely refer to these entities collectively, as "Neways 1 through 7."

conversations with Thomas Mower regarding Neways 1 through 7, and the need for Neways US to get money from Neways Australia. He assumed the commission payments to Neways 1 through 7 were going to Neways US, because that was why they set up Neways 1 through 7 in the first place. The Neways 1 through 7 entities received commission checks and later, wire transfers, from Neways Australia's bonus checking account. On its books and records, Neways Australia treated these payments as expenses.

Michael Cunningham, a former CEO of Neways Australia, did not know what happened to the commission checks for the Neways 1 through 7 entities after Neways Australia sent the checks to Utah. Marija Lee testified that she sent them to Utah, and none of the checks were ever voided. John Hunter testified that he sent the checks directly to Thomas and Leslie Mower in Utah, although he had no idea what happened to them after they reached the United States. When the checks were late a couple of times, Leslie Mower called Mr. Hunter to ask whether they had been mailed. Once, when the Mowers visited Australia, they asked Mr. Hunter to sign some of the checks over to cash, and he obliged.

Neways 1 through 7 distributorships were also set up at the top of the Neways Malaysia downline, and Neways Malaysia sent the commission checks for these distributorships to the United States. At trial, the government introduced commission checks from Neways Malaysia to several of the Neways 1 through 7 distributorships in 1994 and 1995, as well as registers of commission

7

checks from Neways Malaysia for 1996 and 1997. In 1996, the register showed commission checks issued to Neways 1 through 7, as well as Mower Properties 1 through 7, and these entities had the same identification numbers.[4] In 1997, the register showed checks to five other entities with these same identification numbers: Rezults, N. Trust, N. Properties, Eclat, and CC Corp.

Patricia Sandberg, Thomas Mower's former secretary, testified that the Mowers had distributorships in Australia and Malaysia, and she saw checks from these distributorships. Commission checks from Australia and Malaysia arrived once a month through the mail, in envelopes addressed to Thomas Mower personally. A downline report accompanied the checks, and the checks corresponded to amounts on the downline report. Ms. Sandberg understood the commission checks to be from distributorships that the Mowers had in Neways Australia and Neways Malaysia. Usually, she gave the checks to Thomas Mower; sometimes, he gave them back, and she deposited them in an account for "Rezults," per his instructions. Thomas Mower always had the checkbook for the Rezults account in his possession, and he had signatory authority over the account. Neways US had no records for this account. Ms. Sandberg did not know what the Rezults account was used for, but she thought some of the money

---

[4] The check registers listed the identification numbers in the column reserved for each payee's Social Security number. For example, both Neways, Inc. 1 and Mower Properties, Inc. 1 had the identification number 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 on the check registers.

may have gone toward the purchase of a warehouse constructed for Neways US. The corporate accounting department at Neways US never saw the commission checks from Australia and Malaysia, never came to ask about them, and never knew that she deposited them. Annette Jenkins, who worked in the accounting department until 1998, testified that, to her knowledge, Neways US never received any commission checks.

Patricia Sandberg also identified several commission checks from Neways US, payable to the following people and entities: Thomas Mower; Neways Independent Distributorship Adpool; Base of the Tree; Brett Mower[5]; Lead Allocation, Darrid; MP Trust; Orphanage; MP Enterprises; and BW Enterprises. All of these were endorsed, in some capacity, by Thomas or Leslie Mower, or in Thomas or Leslie Mower's handwriting. In addition, David Bevans, who worked in the IT department at Neways US in 1996 and 1997, testified that he gave bonus reports to Leslie Mower and that she would sometimes stop by the IT department to pick up distributor checks, asking, "Are my checks ready?"

Another entity, Mower Properties, Inc., was the property holding company for Neways US. Neways US leased much of its real property from Mower Properties, including a manufacturing facility, office space, and a warehouse. Karin Lane, who worked in the Neways US accounting department, testified that

---

[5] Brett Mower is the Mowers' son.

she did the accounting work for Mower Properties. During the years 1994, 1995, and 1996, the Mower Properties bank account received monies via wire transfer from Neways Australia. Ms. Lane thought they were loans or loan proceeds from Australia, and she treated them as such on Mower Properties' financial records. Between October 17, 1994, and July 17, 1996, a total of $736,759 was wired from Neways Australia into the Mower Properties account.

In 1993 or 1994, the Mowers purchased a property called Hobble Creek. David Simpson, the real estate broker for the transaction, testified that he dealt mostly with Thomas Mower. The purchase price for the property was $650,000, of which the Mowers paid $141,621 as a down payment. They paid the remaining $508,379 of the balance within one year of the purchase. The Mowers paid for the property using checks in U.S., Australian, and Malaysian currency, so the parties to the transaction set up a trust account at First Security Bank. The Mowers would deposit the checks into the trust account, and the bank would convert the amounts to U.S. dollars and issue a new check to the sellers of the property. Almost all of the Mowers' checks were Australian or Malaysian commission checks payable to the Neways 1 through 7 entities. One of the checks was a U.S. commission check for $54,427.56, payable to Thomas Mower. Mr. Simpson testified that he would pick up the checks from Thomas Mower personally, and not from anyone in corporate accounting at Neways US. The warranty deed for the property stated that the sellers "hereby convey and warrant

10

to Thomas Mower, trustee of the Mower Family Trust." The Mower Family Trust is a trust controlled by several members of the Mower family, and the Mowers' personal residence was held by the Mower Family Trust.

John Hunter learned about Hobble Creek in 1994. Thomas Mower told him that it was a piece of property they were going to acquire, and he wanted to build a new house on the property, in part because he wanted room to display full-sized animal trophies. Leslie Mower also wanted to move, because she wanted more space for her horses. John Hunter did not know how the property was ultimately used, and he testified that multi-level marketing companies sometimes purchase recreational properties. David Simpson testified that Thomas Mower talked about building a house on the property, although Thomas Mower also stated that he wanted to use the property for corporate retreats and to entertain corporate guests. There was no house on the property at the time of sale, and no house was built after the sale.[6] The property was eventually used for some corporate functions.

On March 27, 1997, Agent Elder of the IRS arrived at the Neways US headquarters, looking for Thomas Mower. Patricia Sandberg and Agent Elder testified that Ms. Sandberg was the only person present when Agent Elder arrived, and she told him that Thomas Mower was unavailable. Allen Davis testified, on

---

[6] Mr. Simpson also sold a contiguous piece of property to other members of the Mower family. This property has a barn with a "Neways" sign on it, and a pavilion was built on this property for entertaining. Mr. Simpson did not know who presently owned the property.

11

the other hand, that when the IRS arrived, the legal department was notified, and he went to the lobby with James Thompson to meet with Agent Elder. James Thompson, who was then an attorney for Neways US, told Agent Elder that Thomas Mower was not present—which was untrue—and that they could set up a meeting for a later time. After Agent Elder left, James Thompson and Allen Davis went to Thomas Mower's office and told him that the IRS was investigating. They informed Thomas Mower that he could either cooperate or refuse to cooperate, and he told them to cooperate.

Thomas Mower also told Allen Davis and James Thompson that Hobble Creek might be an issue. Allen Davis and James Thompson began searching the legal and accounting records for documentation of the purchase. They did not find anything, but they knew it had been purchased with funds from Australia. Prior to Agent Elder returning a second time, they called Mr. Cunningham in Australia to try to determine the details of the transaction and whether there was any supporting documentation. Thomas Mower participated in the call. Mr. Cunningham informed them that the monies used to purchase Hobble Creek were commission payments, not a loan. Thomas Mower disagreed with this assessment; he believed that the monies were a loan from Neways Australia and that Neways Australia had recorded them incorrectly.

Before Agent Elder returned, Allen Davis, James Thompson, and Thomas Mower discussed whether there was any documentation of a loan from Neways

12

Australia for the purchase of Hobble Creek. When they could find none, James Thompson decided to create a document to support the loan. The document that he created, however, was back-dated to January 6, 1994. Thomas Mower signed the loan document, which stated that Neways Australia had loaned $650,000 to the Mower Family Trust for the purchase of Hobble Creek.

When Agent Elder returned, he met with Thomas Mower, Allen Davis, and James Thompson. Thomas Mower told Agent Elder that he did not have any distributorships in the Neways US downline. He told Agent Elder that he did not receive any checks for any distributorships, and that he left with the company any monies to which he might be entitled. He also stated that he did not know what MP Trust was. Although Thomas Mower disclosed several individual and corporate bank accounts to Agent Elder, he did not mention the Rezults account.

Thomas Mower also told Agent Elder that Hobble Creek had been purchased with a loan from Neways Australia. When Agent Elder asked for documentation, James Thompson and Allen Davis left the room to retrieve the newly created loan document. Upon their return, James Thompson handed a folder to Thomas Mower, who reviewed the loan document and handed the folder to Agent Elder. No one told Agent Elder that the loan document was back-dated. Allen Davis later told Leslie Mower about the back-dated loan document, and he continued to keep Leslie Mower apprised of the situation, although she was not directly involved in it.

13

After the meeting, Allen Davis and James Thompson continued searching for documentation, and they attempted to gather additional information from the accounting department and Neways Australia. They continued to have phone conversations with Michael Cunningham in Australia, and they kept Leslie Mower apprised of what was happening. They verified that Neways Australia had treated the Hobble Creek monies as commission payments, rather than as a loan. They determined that, because the property was in the name of the Mower Family Trust, and because they believed that Thomas Mower was the payee on the commission checks, the income was personal income to the Mowers, and the Mowers needed to amend their individual income tax returns.

For his part, Agent Elder traveled to Australia to investigate the payments made by Neways Australia. Thomas Mower gave him permission to review the books of Neways Australia, but no one informed Agent Elder that there was actually no Hobble Creek loan. On October 31, 1997, Allen Davis wrote a letter to Agent Elder, informing him that Neways Australia had not properly recorded the money as a loan, and that they were amending the Neways US corporate tax returns to reflect the amounts. This letter was the first time anyone informed Agent Elder that Neways Australia might not have recorded these monies as a loan, or that Hobble Creek was an asset of Neways US rather than the Mower Family Trust. During his investigation at Neways Australia, Agent Elder found no evidence that a loan had been made to anyone—including the Mower Family

14

Trust, Mower Properties, or the Mowers personally. When he returned from Australia, he told Allen Davis that Neways Australia had not recorded the payments as a loan. He also interviewed Leslie Mower sometime in 1998, and she told him that she directed the financial operations of Neways US and that anything financial at Neways US would have to go through her.

Meanwhile, in the aftermath of the meeting with Agent Elder, James Thompson contacted Agent Elder and left two telephone messages on his answering machine. The first was on April 4, 1997, and stated:

> Hello, this is James Thompson, calling, uh . . . uh . . . on behalf of Tom Mower, uh . . . we have been going through documents and-and things that . . . trying to get whatever else might be available in this matter. Uhm, I thought I should call you and just talk to you. Basically to let you know that, uhm . . . uh . . . we have been unable to find anything new, uhm . . . I'm not sure what we would be looking for new. Uhm, I believe you have everything, uhm . . . apparently what happened, what you thought happened did happen, uh, the checks came, uhm . . . he signed them over directly, uh-uhm . . . got the loan from the, uh . . . Australian organization and, uh . . . must pay that back, uh . . . within five years thereof, I believe that answers all your questions, uhm . . . we've gone through everything and haven't been able to find anything more. So . . . I'm not sure what more we would be looking for at this point. But if there's something specifically . . . uh, that you want us to find on that deal, let us know, but-but actually that pretty much covers it, I think. So, if you'll call me back at four two three twenty-eight hundred (423-2800), again, this is James Thompson and, uh . . . and we'll see where we need to go. Okay? Thanks a lot, bye-bye.

Tr. at 705-09; Gov't Ex. 21-5, 21-5A. The second message was on April 8, 1997, and stated:

> Hi, Ted. James Thompson here. Uhm . . . I was just looking over

15

the file again, uh . . . we've been running around seeing if we can't find anymore documents and we've been unable to do so . . . uh, just like the message I left you the other day. I'm not sure what else that-that we might be looking for that would interest you. Uhm . . . so far we just have not found any other documents. So, if you could let me know what you prefer as you know we're . . . we have several summonses that, uh . . . that would be quite burdensome if we tried to produce all of that information and you did mention there were other properties that you might be interested in getting information on, but as I understood it, as you left, really you wanted to focus on the Hobble Creek property and so that's what we've been focusing on and I got the feeling from you that . . . that if you were satisfied, uhm . . . about the facts surrounding that, that you wouldn't . . . that you wouldn't really care to, uh . . . make us dig into everything else, uh . . . so I haven't, I haven't dug into anything else yet. But I wanted you to know that I'm not just ignoring you, that, uh . . . that I want to do whatever you . . . want to do on this. Because you're within your right to ask for certain information, but, uh . . . just because of the burden, I hope to avoid it. So, you let me know if you would. I'm, again, James Thompson at four two three twenty-eight hundred (423-2800). Uh, and again . . . I assume, you know, this is the . . . uh . . . (CHUCKLES) . . . the Tom Mower matter and, uh . . . if there's anything I can do, let me know, but I don't want to just keep you hanging out there, all right? Thanks a lot. Bye-bye.

Tr. at 705-09; Gov't Ex. 21-5, 21-5A. Agent Elder testified that he viewed these messages as an attempt by James Thompson to represent that they had given him everything, and that he did not need to investigate further.

For his part, Michael Cunningham testified that he participated in a conference call with Thomas Mower, Allen Davis, and Karin Lane, in which Thomas Mower asked Mr. Cunningham if Neways Australia had any

16

documentation for a loan from the Mowers to Neways Australia.[7]  Ms. Lane also

sent a fax to Neways Australia on October 13, 1997, inquiring as to whether they

had found any documentation for a loan.  John Dwyer, an in-house accountant at

Neways Australia, prepared a response, dated October 17, 1997, in which he

stated:

> All payments from [Neways Australia] to Thomas Mower are for
> BONUSES for the Mower downline paid from the MLM system.  To
> my knowledge no Loan was made to Neways Australia and the
> majority of the payments listed were not Loan repayments but are
> BONUS payments for the Mower Australian downline.

Tr. at 213, 215, 421-22; Gov't Ex. 20-13.[8]  In addition, Mr. Cunningham testified

that he was not aware of any loans between Neways Australia and the Mowers

personally, or between Neways Australia and the Mower Family Trust or Mower

Properties.  John Hunter similarly testified that Neways Australia never loaned

money to the Mowers individually, or to the Mower Family Trust, Mower

---

[7] Allen Davis testified that Thomas Mower viewed the Hobble Creek monies as a loan from Neways Australia, whereas Mr. Cunningham's testimony, Mr. Dwyer's fax, and Ms. Lane's testimony stated that Thomas Mower viewed other monies as repayment for a loan from Thomas Mower to Neways Australia. This distinction probably results because Mr. Cunningham, Mr. Dwyer, and Ms. Lane were mostly testifying about the monies wired to the Mower Properties account—not the Hobble Creek monies—but it is not entirely clear from the testimony.

[8] Mr. Cunningham and Allen Davis testified that, in referring to the "Mowers," John Dwyer's response may have been referring to the companies themselves, because people in the Neways companies often failed to distinguish between the companies and the Mowers personally.  Mr. Cunningham further testified that his testimony was consistent with Neways US owning the Neways 1 through 7 distributorships.

17

Properties, or Neways 1 through 7. Moreover, Mr. Hunter testified that Neways Australia would not have made loan payments with commission checks.

Karin Lane likewise testified about the conference call and the alleged loan. Part of the conference call dealt with the characterization of the monies wired to the Mower Properties account. She originally thought that these were loan proceeds, but Mr. Cunningham told her that they were distributor income. She realized that she had incorrectly characterized the monies on Mower Properties' tax returns and that she would have to amend the returns. However, the returns were never amended.

After Ms. Lane received the fax from John Dwyer, she decided to amend the Mowers' individual income tax returns to include the monies wired to the Mower Properties account. These monies included $44,209.59 in 1994, $449,095.13 in 1995, and $328,593.15 in 1996, for a total of approximately $821,897. Ms. Lane also found a check for $54,427, dated March 20, 1994, and payable to Thomas Mower, which she included in the Mowers' income. From this information, a hired accounting firm prepared 1040Xs for the years 1994, 1995, and 1996, stating that the Mowers' owed $39,220, $181,177, and $128,841 in taxes, penalties, and interest for those years, respectively. A later review by the IRS indicated that the amended returns primarily addressed payments made to the Mower Properties account.

The Mowers, however, never filed the amended individual income tax

returns. Thomas Mower decided not to file them, and Allen Davis told Karin Lane that the beneficiary of the monies was actually Neways US, and not Mower Properties or the Mowers personally. Allen Davis testified that he had originally thought that Thomas Mower was the payee on the commission checks. This was actually not the case, and when Allen Davis discovered that the payees were the Neways 1 through 7 entities, he recommended to Thomas Mower that the Mowers not file the amended individual returns. Instead, Thomas Mower decided to file amended corporate returns for Neways US, reporting additional income of $283,934.30 for 1994 and $247,233.18 for 1995. They filed the returns in early 1998, and paid the taxes, penalties, and interest owing on the additional income. Thomas Mower remained adamant, though, that the monies were loans and not commissions. Allen Davis informed Leslie Mower about these decisions, and she signed amended corporate returns for Neways US on January 6, 1998.

Karin Lane testified that, even though certain monies were wired directly into the Mower Properties account, they submitted the amended corporate tax returns for Neways US to account for these monies because Neways US was the actual beneficiary—and the amounts were loans from Neways US to Mower Properties. When she filed the amended returns for Neways US, Karin Lane did not yet know about certain other monies. For instance, she did not know about the Rezults account. She did not know about Hobble Creek. She did not know about the commission checks from Neways Malaysia or from Neways Australia.

19

Eventually, when she found out about Rezults and Hobble Creek, she had to ask the accounting firm to prepare another set of amended returns.

Finally, Ms. Lane testified that, when she was preparing the Mowers' individual income tax returns, Leslie Mower informed her that the Mowers had a downline called MP Trust, listed under Thomas Mower's Social Security number. Leslie Mower told Karin Lane that the Mowers received monies from MP Enterprises, Base of the Tree, Revenol, Employee Purchases, BP Sales, and BW Enterprises. Additionally, Ms. Lane discovered that sometimes the Mowers would not cash their distributor checks, particularly if the company was having money troubles, and the Mowers paid some of Neways US's and Mower Properties' bills from the Mowers' personal checking account. Ms. Lane also testified that the Mowers had loaned a lot of money to Mower Properties, that the accounting staff knew about these monies and treated them as loans, and that, when the Mowers received payments from Mower Properties, the payment amounts were subtracted from the loan amounts. Ms. Lane identified several checks and deposited items, payable to Thomas Mower or MP Trust, that had been deposited in the Mower Properties account and had been treated as loans from the Mowers to Mower Properties. These deposits totaled $411,536.91 from 1994 to 1997. Ms. Lane admitted, though, that other deposits into the Mower Properties account during the same time period were commission income that no one had reported.

The government devoted substantial time at trial to the testimony of its expert, IRS Agent Renae Trask. Agent Trask compiled checks, deposit slips, and bank records, and she created summaries of all of the commission checks that the government could discover and that the government alleged were personal income to the Mowers. At least one piece of evidence supported each item listed on the summaries, and she converted amounts in Australian or Malaysian currency to U.S. dollars using the conversion rate at the time of each transaction. Exhibit 81-1 listed all of the checks and wire transfers that the government had been able to discover, and it included all of the information from each transaction: the check date, payor, check number, payee, amount (in U.S. dollars), disposition (if known), disposition date, endorsement (if any), and exhibit number.

Exhibit 80-3 summarized all of the amounts by year and listed the total commission income for each year from each country, the commissions reported by the Mowers on their tax returns, and the total unreported commissions. Agent Trask testified that, in creating this exhibit, she assumed the commissions were the Mowers' personal income. She believed this was a valid assumption for many reasons, including: (1) Thomas Mower originally wanted the Neways Australia commission checks made out to him personally, and John Hunter suggested the Neways 1 through 7 entities as an alternative; (2) all of the Neways 1 through 7 checks were pulled and sent to Utah, addressed to the attention of Thomas and Leslie Mower; (3) the Neways US accounting department was unaware of these

21

checks; (4) Hobble Creek was purchased with these funds, and it was owned by the Mower Family Trust; (5) all of the funds were disposed of at Thomas Mower's direction; (6) no one at Neways US knew this money existed until the IRS began investigating in 1997; (7) John Dwyer's letter stated that these were "BONUSES for the Mower downline"; (8) these were clearly commission checks, and not loans; and (9) John Hunter personally handed some checks to the Mowers and signed them over to cash. For 1992, she calculated the unreported commissions to be $179,362; for 1993, $512,606; for 1994, $1,028,455; for 1995, $555,648; for 1996, $536,711; and for 1997, $397,033. The unreported commissions totaled $3,209,815.[9] In 1996 alone, the Mowers reported only half of the commission income that they received from Neways US, and none of the commission income that they received from either Neways Australia or Neways Malaysia. Ultimately, Agent Trask calculated the total tax due and owing as $1,262,081.

Other exhibits detailed specific dispositions of commission checks. Exhibit 81-5 summarized a series of deposits on July 27, 1994, into Leslie Mower's savings account, all from checks dated June 20, 1994, and made out to Neways 2, 4, 5, 6, and 7. These amounts totaled $55,302.83. Agent Trask did not believe that the Mowers had made a mistake in depositing these amounts in Leslie

---

[9] The total commissions were $3,775,764, from which she subtracted reported commission income of $565,949.

Mower's savings account, although the defendants introduced evidence showing that, in January 1995, the Mowers transferred $20,000 from this account into the Mower Properties checking account and $40,000 from this account into the Neways US corporate account. Exhibit 100-1 showed how the payee names on the commission checks changed over time from 1992 to 1998. Many of the entities listed as payees on the commission checks—including Neways Independent Distributor Ad Pool, Base of the Tree, MP Enterprises, BP Sales International, BW Enterprises, Rezults, and the Mower Family Trust—had never paid federal taxes. Moreover, two bank accounts—the Mowers' personal checking account and the Rezults account—had been opened using Social Security numbers for two of the Mowers' children.[10]

Exhibits 100-2 and 100-3 summarized the disposition of the Neways Australia and Neways Malaysia checks, respectively, between 1994 and 1997. Exhibit 100-4 summarized all commission income from all three entities—Neways US, Neways Australia, and Neways Malaysia—between 1992 and 1997. A total of $712,111 was listed as "unknown" on the summary, and it consisted mostly of Australian commission checks for which the government did

---

[10] During a previous audit in 1993, the IRS had discovered something similar: a bank account that was not included on Images & Attitudes' tax returns, that had a different identification number than Images & Attitudes'. The account was in the name of "Images International, Inc." and was located in Van Alstyne, Texas.

23

not know the ultimate disposition. Of the approximately $2.3 million in commission income from Neways Australia between 1992 and 1997, no person or entity reported any of it before the IRS began investigating.

At the close of the government's evidence, the defendants moved for a judgment of acquittal under Fed. R. Crim. P. 29, but the district court denied the motion. The defendants then called two witnesses: Wade Winegar, a former general counsel at Neways US, and E. Gail Anger, an expert witness.

Mr. Winegar testified that, when he began working in the legal department at Neways US in 1999, he found a lot of corporate structures that various people had set up over the years, and the Mowers did not understand this set up—they just followed their attorneys' advice. The Mowers viewed all of the structures as one "big ball of wax," and they did not view the corporate structures as separate legal entities. Money flowed freely between the different corporations, and although these transfers should have been treated as inter-company loans, no documentation supported this treatment. The Mowers had intended Mower Properties to be a real estate holding company for all of the other companies, and Mower Properties paid the property taxes on the different properties. The Mowers, though, had not run Mower Properties as a separate legal entity, and the properties had been titled in many different names.

As for Hobble Creek, Mr. Winegar testified that he gathered information about the property and was told that it was a retreat for Neways US, where the

24

company would host distributors and customers. He found verification, including pictures and videotapes in the marketing department at Neways US, and he saw plans for a distributor lodge on Hobble Creek. John Dwyer told him that the checks used to purchase Hobble Creek had come from a payment stream assigned to Mower Properties. A number of payment streams came from Neways Australia, and people at Neways US kept getting confused about whether payments were distributor commissions or pre-payments for product. Also, Hobble Creek was kept on the books of Mower Properties, although Mr. Winegar admitted that it did not appear on Mower Properties' financial statements for 1993, 1994, 1995, or 1996. In 2003, Mr. Winegar re-titled Hobble Creek from the Mower Family Trust to Mower Properties.

The defendants' expert, E. Gail Anger, worked to rebut the testimony of Agent Trask. He disagreed with Agent Trask's conclusion that the commissions were personal income to the Mowers. He stated that nothing in the bonus histories indicated that the Hobble Creek monies were personal to the Mowers, and just because the checks were sent to the Mowers in Utah, and the property was titled in the name of the Mower Family Trust, did not make the Hobble Creek monies personal income. According to Mr. Anger, Mower Properties had "the burdens and benefits of ownership," and Hobble Creek was therefore corporate property. The great bulk of the checks from Neways Australia and Neways Malaysia, moreover, were not payable to the Mowers personally. In addition, the

25

unidentified checks were never negotiated, and most of the expenses paid out of the Rezults account were corporate expenses. Mr. Anger also testified that, eventually, all of the unreported items identified by the government—except the checks that were not negotiated—were reported on amended corporate income tax returns for the various companies.

On cross-examination, though, Mr. Anger admitted that Agent Trask had "a reasonable argument," even if he disagreed with her. He also admitted that no one ever reported any of the $3.2 million in any originally filed tax returns, and that Neways US should not have been the entity amending its returns if the income was the income of Mower Properties. Further, he admitted that the accountants at Neways US should have known about the money if it was corporate income.

At the close of the evidence, the defendants renewed their motions for acquittal, which the district court denied. After the jury was instructed and the case submitted, the jury found all three defendants guilty on all counts. Subsequently, Thomas Mower and Leslie Mower renewed their motions for acquittal, or in the alternative, for a new trial, and James Thompson renewed his motion for acquittal. The district court denied the motions.

Prior to sentencing, the district court held a hearing pursuant to U.S.S.G. § 6A1.3, at which the parties presented their proposed tax loss findings for sentencing. The district court then issued its tax loss findings. After detailing the

evidence and its own findings of fact, the district court calculated Thomas Mower's tax loss to be $199,775. Under U.S.S.G. § 2T4.1 (2005), the base level for this tax loss amount was 16. The district court calculated Leslie Mower's tax loss to be $89,112, which also resulted in a base level of 16 under U.S.S.G. § 2T4.1 (2005).

At the sentencing hearing on September 13, 2006, the district court sentenced Thomas Mower first. The district court determined that there were overt acts after 2001, so the 2001 Guidelines applied. The court increased Thomas Mower's base level by 2 for sophisticated means, see U.S.S.G. § 2T1.1(b)(2), and by 2 for playing a leading role, see U.S.S.G. § 3B1.1(c), for a total offense level of 20. Combined with a criminal history category of I, this yielded a Guidelines range of 33 to 41 months, and the district court sentenced Thomas Mower to 33 months' imprisonment, followed by 36 months of supervised release.

The district court also applied the 2001 Guidelines for Leslie Mower, despite her counsel's argument that the 1997 Guidelines were appropriate. The court increased her base level by 2 for sophisticated means, see U.S.S.G. § 2T1.1(b)(2), resulting in a total offense level of 18, which combined with a criminal history category of I for a Guidelines range of 27 to 33 months. The district court sentenced her to 27 months' imprisonment, followed by 36 months of supervised release.

Lastly, the district court sentenced James Thompson to a term of imprisonment for 12 months and a day, followed by 24 months of supervised release.

## II.

### *Sufficiency of the evidence*

On appeal, all three defendants challenge the sufficiency of the evidence to support their convictions. Thomas Mower challenges the sufficiency of the evidence as to his conviction for tax evasion for the years 1992, 1993, and 1997. Leslie Mower challenges the sufficiency of the evidence as to all counts—conspiracy to defraud the United States, and tax evasion for the years 1992 through 1997. James Thompson challenges the sufficiency of the evidence as to both counts—conspiracy to defraud the United States, and corruptly endeavoring to interfere with the administration of internal revenue laws.

"'Evidence is sufficient to support a conviction if a reasonable jury could find the defendant guilty beyond a reasonable doubt, given the direct and circumstantial evidence, along with reasonable inferences therefrom, taken in a light most favorable to the government.'" United States v. Nelson, 383 F.3d 1227, 1229 (10th Cir. 2004) (quoting United States v. Wilson, 107 F.3d 774, 778 (10th Cir. 1997)). "We will not weigh conflicting evidence or second-guess the fact-finding decisions of the jury." United States v. Summers, 414 F.3d 1287, 1293 (10th Cir. 2005). "Rather than examining the evidence in 'bits and pieces,'

28

we evaluate the sufficiency of the evidence by 'considering the collective inferences to be drawn from the evidence as a whole.'" Nelson, 383 F.3d at 1229 (quoting Wilson, 107 F.3d at 778).

As a preliminary matter, both Thomas and Leslie Mower rely heavily on the district court's tax loss findings at sentencing in attacking the sufficiency of the evidence to support their convictions. The tax loss findings, however, do not alter our sufficiency review for three reasons. First, the district court's determination of a tax loss for sentencing purposes and the jury's determination of guilt based upon the sufficiency of the evidence are different and distinct inquiries. See, e.g., United States v. Greene, 239 F. App'x 431, 447 (10th Cir. 2007) (rejecting the defendant's argument that the district court was prohibited from calculating the tax loss based upon facts found at sentencing); United States v. Kosinski, 480 F.3d 769, 776 (6th Cir. 2007). Granted, in most instances, this distinction becomes relevant where a district court has calculated a greater tax loss than that found by the jury at trial, but there is no reason to blur the two inquiries when the converse situation is presented. Cf. United States v. Scholl, 166 F.3d 964, 981 (9th Cir. 1999) (holding that the district court did not err in finding, during sentencing, that "there was insufficient evidence to make a reasonable estimate of tax loss," where the jury convicted the defendant of violating 26 U.S.C. § 7206(1)). Second, in the instant case, the district court denied the Mowers' respective post-verdict motions for judgment of acquittal,

29

indicating the district court thought that the evidence was sufficient to support the jury's verdicts, notwithstanding the district court's later tax loss findings. Third, given the evidence outlined above, the district court would have been justified in calculating a greater tax loss than it did. In analyzing the Mowers' sufficiency of the evidence claims, therefore, we will disregard the district court's tax loss findings and employ our usual sufficiency of the evidence analysis by reviewing the evidence presented at trial to determine "if a reasonable jury could find the defendant guilty beyond a reasonable doubt, given the direct and circumstantial evidence, along with reasonable inferences therefrom, taken in a light most favorable to the government." Nelson, 383 F.3d at 1229 (citation and internal quotation marks omitted).

A.    *Thomas Mower*

The evidence was sufficient to convict Thomas Mower of tax evasion for the years 1992, 1993, and 1997. He has chosen to appeal these years—and not 1994, 1995, and 1996—because in 1992, 1993, and 1997, the only alleged unreported income was foreign commission income, as opposed to a combination of domestic and foreign commission income. "In order to prove a defendant guilty of tax evasion, the government must show (1) a substantial tax liability, (2) willfulness, and (3) an affirmative act constituting evasion or attempted evasion." United States v. Anderson, 319 F.3d 1218, 1219 (10th Cir. 2003); see also 26 U.S.C. § 7201 ("Any person who willfully attempts in any manner to evade or

30

defeat any tax imposed by this title or the payment thereof shall . . . be guilty of a felony . . . ."). In proving tax evasion, the government's evidence

> is ordinarily circumstantial, since direct proof is often unavailable. Circumstantial evidence in this context may consist of, among other things, a failure to report a substantial amount of income, a consistent pattern of underreporting large amounts of income, the spending of large amounts of cash that cannot be reconciled with the amount of reported income, or any conduct, the likely effect of which would be to mislead or to conceal.

United States v. Kim, 884 F.2d 189, 192 (5th Cir. 1989) (citations and internal quotation marks omitted).

A reasonable jury could have found beyond a reasonable doubt that Thomas Mower had a substantial tax liability for the years 1992, 1993, and 1997. In 1992, several Australian checks, payable to Images 1 through 7, were drawn on the Australian National Bank. One of these checks contained a handwritten note on the front with the words, "Please Pay Cash." John Hunter testified that, when the Mowers visited Australia, they once asked him to sign commission checks over to cash, and he obliged. In addition, the government discovered multiple commission checks from 1992 that had an "unknown disposition." Although the Mowers presented evidence at trial that these checks were not negotiated, the receipt of the checks—and not their negotiation—is the important fact in determining whether income is taxable in a given year. See Walter v. United States, 148 F.3d 1027, 1028-29 (8th Cir. 1998) (explaining, under the theory of constructive receipt, that a lost check was still taxable in the year it was received,

31

even though the defendants did not obtain or cash a replacement check until two years later); see also 26 C.F.R. 1.451-2.  For the doctrine of constructive receipt to apply, the checks must have been personal income to the Mowers, but as explained below, there was more than enough evidence for a reasonable jury to conclude that they were.[11]

As regards 1993, the government produced evidence of a variety of foreign commission checks with a variety of dispositions.  Several of the checks were endorsed directly to pay for Hobble Creek.  Others were deposited in the Rezults account.  Multiple foreign commission checks from 1993 had an "unknown disposition."  In 1997, a number of foreign commission checks were deposited in the Mower Properties account, the Rezults account, and the Neways US account.

Most importantly, the evidence indicated that the foreign commission checks were personal income to the Mowers.  Thomas Mower originally wanted the Neways Australia commission checks made out to him personally, and he only created the Neways 1 through 7 entities after John Hunter suggested it.  All of the foreign commission checks were pulled and sent to Utah, addressed to the attention of Thomas Mower.  No one in the corporate accounting department at

---

[11] Ordinarily, the doctrine of constructive receipt applies to prevent taxpayers from shifting income into subsequent tax years (e.g., to obtain a more favorable marginal tax rate).  Assuming the commission checks were personal income to the Mowers, though, there is no reason for us to refrain from applying this doctrine here.

Neways US was aware of the checks until after the IRS began investigating in 1997. John Hunter personally signed several of the commission checks over to cash and handed them to the Mowers, and one of the 1992 commission checks has "Please Pay Cash" on the front of it. All of the funds were disposed of at Thomas Mower's direction. No one at Neways US—except for the Mowers and Thomas Mower's secretary—knew of the Rezults account, and the Mowers had control over the account. Several of the checks from 1993 were endorsed directly to pay for Hobble Creek, which was titled in the name of the Mower Family Trust and was where the Mowers had planned to build a house. Further, no one at Neways US knew about Hobble Creek until after the IRS became involved. Even the false loan document stated that the "loan" for Hobble Creek was to the Mower Family Trust, not to any of the corporations. John Dwyer's letter stated that these were "BONUSES for the Mower downline." Also, despite the Mowers' insistence that these were loans or loan repayments, they were clearly commission checks, and the evidence showed that when the Mowers needed a loan for Neways US from Neways Australia, they knew how to accomplish it—and how to include it on the books of both companies. Most significantly, despite the Mowers' insistence that these monies were corporate income, and not personal income, no person or entity paid any taxes on the $2,384,849 of Australian commission income or the $324,554 of Malaysian commission income until after the IRS began investigating in 1997. Finally, the Mowers continually changed their story as to what these

33

commission checks actually were—loans from Neways Australia, loan repayments from Neways Australia, income to Neways US, income to Mower Properties, etc. Taken together, the evidence was more than sufficient for the jury to find beyond a reasonable doubt that the commission checks were personal income to the Mowers, for which they incurred a "substantial tax liability." Anderson, 319 F.3d at 1219.

Additional evidence—and much of the evidence listed above—showed that Thomas Mower's failure to report these monies was "willful[]." Id. Asking John Hunter to endorse checks directly to cash shows willfulness as to the 1992 amounts. In addition, Thomas Mower endorsed checks directly to purchase Hobble Creek in 1993, and he presented a false, back-dated loan document to the IRS in an effort to cover up the purchase. He lied to Agent Elder about not having a distributorship in Neways US. Further, the sheer number of shell corporations and entities that the Mowers created here—and which were payees for the various commission checks—is nothing short of astounding, as is the number of different payees indicated on the commission checks, as well as the number of different accounts in which the Mowers deposited all of the commission checks. Along these same lines, the Mowers frequently opened bank accounts under incorrect Social Security or employer identification numbers. From this circumstantial evidence, a reasonable jury could have found beyond a reasonable doubt that Thomas Mower's failure to report these amounts was

34

willful.

Finally, the evidence showed affirmative acts of evasion for each year. "An affirmative act requires more than the passive failure to file a tax return; rather, it requires a positive act of commission designed to mislead or conceal." United States v. Meek, 998 F.2d 776, 779 (10th Cir. 1993). The government only needed to show one affirmative act of evasion for each count of tax evasion, see Anderson, 319 F.3d at 1219; Meek, 998 F.2d at 779, and here, many of the affirmative acts of evasion related to multiple years. For instance, the creation and presentation of the false, back-dated loan document certainly qualifies as an affirmative act of evasion—arguably for all six years of tax evasion, and at the very least for 1993 and 1994. Later, and long after the IRS began investigating, the Mowers had Neways US file several sets of amended corporate returns, in which they attempted to claim that the commissions were actually corporate income, rather than personal income. A reasonable jury could have found beyond a reasonable doubt that these were affirmative acts of evasion as to the foreign commission checks issued in 1992, 1993, and 1997.

In his argument on appeal, Thomas Mower contends that the evidence did not comport with the government's use of the "specific items method" of proving tax evasion. Under the specific items method, "the Government . . . produce[s] evidence of the receipt of specific items of reportable income by the defendant that do not appear on his income tax return or appear in diminished amount."

35

United States v. Horton, 526 F.2d 884, 886 (5th Cir. 1976) (contrasting this with the "net worth method," whereby the government shows an "increase in the taxpayer's net worth during the period in question in an amount greater than that reported to IRS"); see also United States v. Merrick, 464 F.2d 1087, 1092 (10th Cir. 1972). Contrary to Thomas Mower's argument, the government's use of the specific items method does not require the government to prove any additional elements beyond those laid out in Anderson, 319 F.3d at 1219. Rather, the specific items method merely states the obvious with regard to the government's burden to show a "substantial tax liability" under 26 U.S.C. § 7201: the government must produce evidence of a specific item of reportable income that the defendants did not—but should have—included on their income tax returns. The government has done so in the instant case, and the evidence was sufficient to support Thomas Mower's convictions.

B.    *Leslie Mower*

1.    *Conspiracy*

There was sufficient evidence for a reasonable jury to find Leslie Mower guilty beyond a reasonable doubt of conspiracy to defraud the United States. The elements of conspiracy under 18 U.S.C. § 371 are "that (1) the defendant entered into an agreement; (2) the agreement involved a violation of the law; (3) one of the members of the conspiracy committed an overt act; (4) the overt act was in furtherance of the conspiracy's object; and (5) the defendant wilfully entered the

36

conspiracy." United States v. Weidner, 437 F.3d 1023, 1033 (10th Cir. 2006).

"Secrecy and concealment are often necessary to a successful conspiracy, and, as

a result, direct evidence of the crime is frequently difficult to obtain." Id.

Consequently, "conspiracy convictions may be based on circumstantial evidence,

and the jury may infer conspiracy from the defendants' conduct and other

circumstantial evidence indicating coordination and concert of action." Id.

(citation and internal quotation marks omitted).

The evidence was sufficient to show that Leslie Mower entered into an

agreement to conceal approximately $3.2 million in foreign and domestic

commission income. "'The core of a conspiracy is an agreement to commit an

unlawful act.'" Id. (quoting United States v. Morehead, 959 F.2d 1489, 1500

(10th Cir. 1992)). "The existence of the agreement to violate the law may be

inferred from a 'unity of purpose or common design and understanding' among

conspirators to accomplish the objects of the conspiracy." Id. (quoting United

States v. Kendall, 766 F.2d 1426, 1431 (10th Cir. 1985)). Leslie Mower was the

Chief Financial Officer of Neways US. She was aware of the foreign commission

checks and knew what they were, and, when the commission checks did not arrive

on time, she would call John Hunter to inquire. In her interview with Agent

Elder, she told him that she directed the financial operations of Neways US and

that anything financial at Neways US would have to go through her. She was

with her husband in Australia when they asked John Hunter to sign several of the

37

commission checks over to cash. She often picked up the domestic commission checks from Neways US, and her endorsement appears on several of the domestic commission checks. Several commission checks were deposited into her personal savings account. She never disclosed these payments to anyone at Neways US, including Annette Jenkins and Karin Lane when she asked them to prepare the Mowers' individual income tax returns. She was aware of the purchase of Hobble Creek and told John Hunter that she wanted to build a new house there. In addition, Allen Davis continually kept her apprised of the IRS investigation, including the false loan document that her husband presented to the IRS. Finally, despite all of this, Leslie Mower ultimately signed the amended corporate tax returns that Neways US filed to mislead the IRS after the investigation began.

The totality of this evidence was sufficient to prove beyond a reasonable doubt that Leslie Mower entered into an agreement with her husband to defraud the United States. It was also sufficient to show beyond a reasonable doubt that she entered into the agreement willfully. See Weidner, 437 F.3d at 1033. In addition, even though the government only had to prove that one of the members of the conspiracy committed an overt act in furtherance of the conspiracy, see id., the evidence contained several examples of overt acts committed by Leslie Mower herself. The evidence was sufficient to convict Leslie Mower of conspiracy to defraud the United States.

## 2. *Tax evasion*

Leslie Mower's challenge to the sufficiency of the evidence also fails with regard to the six counts of tax evasion. "In order to prove a defendant guilty of tax evasion, the government must show (1) a substantial tax liability, (2) willfulness, and (3) an affirmative act constituting evasion or attempted evasion." Anderson, 319 F.3d at 1219.

For the same reasons as her husband, Leslie Mower had a "substantial tax liability" in 1992, 1993, and 1997. In 1994, 1995, and 1996, there was evidence of unreported income from the foreign commission checks, and for those years, the government also produced evidence of unreported domestic commission income. The government's evidence of unreported income in 1994, 1995, and 1996 included: foreign commission checks used to purchase Hobble Creek in 1994; domestic and foreign commission checks deposited in Leslie Mower's savings account in 1994 and 1995; domestic commission checks deposited in the Mowers' checking account in 1994, 1995, and 1996; domestic and foreign commission checks deposited in the Mower Properties account in 1994, 1995, and 1996; domestic and foreign commission checks deposited in the Rezults account in 1994, 1995, and 1996; foreign commission checks drawn on the National Australia Bank in 1994 and 1995; and domestic and foreign commission checks of "unknown disposition" in 1994 and 1996. As explained previously, the evidence was sufficient for a reasonable jury to conclude beyond a reasonable doubt that

39

this was personal income to the Mowers.

In addition, the evidence previously cited as supporting Leslie Mower's conviction for conspiracy to defraud the United States was also sufficient to show the final two elements for all six counts of tax evasion: "(2) willfulness, and (3) an affirmative act constituting evasion or attempted evasion." Anderson, 319 F.3d at 1219. The government presented sufficient evidence for a reasonable jury to convict Leslie Mower of tax evasion for the years 1992 through 1997.

C.    *James Thompson*

1.    *Conspiracy*

There was also sufficient evidence to convict James Thompson of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. The elements of conspiracy are "that (1) the defendant entered into an agreement; (2) the agreement involved a violation of the law; (3) one of the members of the conspiracy committed an overt act; (4) the overt act was in furtherance of the conspiracy's object; and (5) the defendant wilfully entered the conspiracy." Weidner, 437 F.3d at 1033. James Thompson was aware that there was no documentation to support treating the monies used to purchase Hobble Creek as a loan, and further, that Neways Australia had not accounted for the monies as a loan. Yet, he decided to create a false, back-dated loan document for the transaction. Then, during Agent Elder's interview, James Thompson brought the false loan document to Thomas Mower, who presented it to Agent Elder. Neither

40

James Thompson nor Thomas Mower informed Agent Elder that the document was back-dated. In addition, James Thompson left two messages on Agent Elder's answering machine, in which he tried to convince Agent Elder that they had given him all of the information that they had concerning the alleged Hobble Creek loan.

The evidence was sufficient for a reasonable jury to find James Thompson guilty of conspiracy to defraud the United States. His creation of the false, back-dated loan document, which Thomas Mower ultimately signed, and their joint presentation of that document to Agent Elder, showed "a unity of purpose or common design and understanding" between James Thompson and Thomas Mower, from which a reasonable jury could infer an agreement to commit an unlawful act. Weidner, 437 F.3d at 1033 (citations and internal quotation marks omitted). In addition, this series of events contained several overt acts in furtherance of the conspiracy, as well as evidence of willfulness. The evidence was sufficient to support James Thompson's conviction for conspiracy.

2. *Obstruction*

The evidence was also sufficient for a reasonable jury to convict James Thompson of corruptly endeavoring to interfere with the administration of internal revenue laws. "In order to establish a violation of 26 U.S.C. § 7212(a), the government must prove that a defendant 'corruptly' endeavored to obstruct and impede the due administration of the internal revenue laws." United States v.

41

Winchell, 129 F.3d 1093, 1098 (10th Cir. 1997). In this context, "to act corruptly means to act with the intent to secure an unlawful benefit either for oneself or for another." Id.

James Thompson was aware of the pending IRS investigation. He responded by creating a false, back-dated loan document, which Thomas Mower signed and which they presented to Agent Elder without informing him that it was back-dated. He knew, before creating the false loan document, that no documentation supported treating the Hobble Creek monies as a loan, and that Neways Australia had not accounted for the monies as a loan. In addition, after presenting the false loan document to Agent Elder, he called Agent Elder and left two messages trying to convince Agent Elder that they had given him all of the information that they had concerning the alleged Hobble Creek loan. This evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that James Thompson "'corruptly' endeavored to obstruct and impede the due administration of the internal revenue laws." Winchell, 129 F.3d at 1098.

*Statute of limitations*

Leslie Mower and James Thompson contend that the government did not bring several of the charges against them within the applicable statute of limitations.[12] Specifically, Leslie Mower contends that the government brought

---

[12] Both Leslie Mower and James Thompson raised this issue before the
(continued...)

42

four of the tax evasion charges—for the years 1992, 1993, 1994, and 1995—outside of the statute of limitations, because the limitations periods began to run when the Mowers filed their personal income tax returns for those years. James Thompson argues that his final phone message to Agent Elder, on April 8, 1997, was not an overt act in furtherance of the conspiracy and was not an attempt to obstruct or impede the IRS, and, as a result, both counts against him are barred by the applicable statute of limitations.

"We review the district court's interpretation of the statute of limitations de novo." Anderson, 319 F.3d at 1219. The limitations period for each count in the Superseding Indictment is six years. See 26 U.S.C. § 6531(2), (6), & (8); United States v. Workinger, 90 F.3d 1409, 1413-14 (9th Cir. 1996).

A.    *Leslie Mower*

The district court correctly determined that the government brought the four counts of tax evasion against Leslie Mower within the six-year limitations period. In Anderson, 319 F.3d at 1219, we adopted the rule, embraced by many of our sister circuits, "that when a defendant commits a series of evasive acts over several years after incurring a tax liability, the statute of limitations begins to run on the date of the last evasive act." See also United States v. Wilson, 118 F.3d

---

[12](...continued)
district court. Thomas Mower raised this issue below, but he does not raise it on appeal.

228, 236 (4th Cir. 1997); United States v. Dandy, 998 F.2d 1344, 1355 (6th Cir. 1993); United States v. Winfield, 960 F.2d 970, 974 (11th Cir. 1992); United States v. DeTar, 832 F.2d 1110, 1113 (9th Cir. 1987); United States v. Ferris, 807 F.2d 269, 270-71 (1st Cir. 1986). In so holding, we expressly approved of the First Circuit's reasoning in Ferris, explaining:

> Section 7201 criminalizes not just the failure to file a return or the filing of a false return, but the willful attempt to evade taxes in any manner. In light of the fact that evasive acts following the filing of a return may be considered part of the offense, . . . "it is the date of the latest act of evasion, not the due date of the taxes, that triggers the statute of limitations."

Anderson, 319 F.2d at 1219-20 (citing and quoting Ferris, 807 F.2d at 271). We also quoted the Sixth Circuit's explanation that "'to hold otherwise would only reward a defendant for successfully evading discovery of his tax fraud for a period of six years subsequent to the date the returns were filed.'" Id. at 1220 (quoting Dandy, 998 F.2d at 1355).

An affirmative act of evasion "requires more than the passive failure to file a tax return; rather, it requires a positive act of commission designed to mislead or conceal." Meek, 998 F.2d at 779. In the instant case, the Superseding Indictment alleged that, for each count of tax evasion, the filing of the false amended corporate income tax returns for Neways US on January 6, 1998, was an affirmative act of evasion. In its closing argument, the government again contended that this filing was an affirmative act of evasion occurring after

44

December 18, 1996—i.e., occurring within six years of when the original indictment was returned against Leslie Mower. Moreover, the jury instructions explained to the jury that it "must unanimously agree that the affirmative act of evasion occurred on or after December 18, 1996." Jury Instruction No. 32, ROA, Vol. V, Doc. 188, at 35. The jury's finding that Leslie Mower was guilty, therefore, necessarily meant that it found beyond a reasonable doubt that she committed an affirmative act of evasion after December 18, 1996. Included in the evidence to support this finding was Leslie Mower's signature on the amended corporate income tax returns for Neways US, filed on January 6, 1998. There was sufficient evidence for the jury to conclude that the statute of limitations did not bar Leslie Mower's convictions for tax evasion.

Leslie Mower argues that our decision in Anderson was contrary to our prior decision in United States v. Payne, 978 F.2d 1177 (10th Cir. 1992), and that "the alleged offense is complete and the six year statute of limitations begins to run when a defendant willfully files a false return on the filing date." L.M. Opening Br. at 38. She is incorrect. In Payne, 978 F.2d at 1179, we addressed the situation where a defendant had committed an affirmative act of evasion but had not yet incurred a tax deficiency. We explained that, because the crime was not complete until the defendant incurred a tax deficiency, the statute of limitations could not begin to run until that point in time. Id. We noted, however, that our holding was consistent with other circuits that had "held that a

45

prosecution under § 7201 is timely if commenced within six years of the last act of evasion," where a defendant incurred a tax deficiency and <u>then</u> committed affirmative acts of evasion. <u>Id.</u> at 1179 n.2. In <u>Anderson</u>, 319 F.3d at 1220-21, we relied upon this language in <u>Payne</u> to reconcile the two cases, and we explained that, where a defendant has already incurred a substantial tax deficiency, the statute of limitations begins to run on the date of the last affirmative act of evasion.[13]

B.    *James Thompson*

The district court correctly determined that the government's charges against James Thompson were not barred by the applicable statute of limitations. For the conspiracy count, the government was required to prove that, within the statute of limitations period, one of the conspirators committed an overt act in furtherance of the conspiracy. <u>See</u> <u>Grunewald v. United States</u>, 353 U.S. 391,

---

[13] Leslie Mower also argues that tax evasion is not a "continuing offense" for statute of limitations purposes. Given that the affirmative acts of evasion are part of the crime itself, and the statute of limitations does not begin running until the affirmative acts are complete, <u>see</u> <u>Anderson</u>, 319 F.3d at 1220-21, the "continuing offense" doctrine is irrelevant here. <u>See</u> <u>United States v. Eklund</u>, 551 F. Supp. 964, 969 (D. Iowa 1982). There is also no reason to distinguish between evasion of assessment and evasion of payment cases for statute of limitations purposes. <u>See</u> <u>United States v. Hunerlach</u>, 197 F.3d 1059, 1065 (11th Cir. 1999).

In addition, as previously discussed, the jury's finding that she committed the affirmative act within the statute of limitations is not negated by the district court's tax loss findings. Further, because Leslie Mower's statute of limitations theory is wrong as a matter of law, she certainly was not entitled to a jury instruction incorporating that theory. Finally, contrary to her contention, there was unreported commission income in 1992.

46

396-97 (1957). Here, because the Superseding Indictment was returned on April 8, 2003, the jury needed to find that one of the conspirators committed an overt act on or after April 8, 1997, and the district court correctly instructed the jury as to the law on this issue.

Even if James Thompson's telephone message to Agent Elder on April 8, 1997, when viewed in isolation, may appear innocuous, it came only days after James Thompson and Thomas Mower presented the false Hobble Creek loan document to Agent Elder. Several statements in the telephone message, moreover, indicate that James Thompson was trying to forestall the government's investigation, and Agent Elder testified that he viewed the message as such. In light of its timing and context, a reasonable jury could have found beyond a reasonable doubt that James Thompson's telephone message to Agent Elder on April 8, 1997, was an overt act in furtherance of the conspiracy.

Further, the government is correct that, because James Thompson did not take the affirmative steps necessary to withdraw from the conspiracy, any of his co-conspirators' overt acts—not just his own acts—may be used to satisfy the statute of limitations as to him. See United States v. Hauck, 980 F.2d 611, 614 (10th Cir. 1992). Even if we were to conclude, therefore, that the telephone message on April 8, 1997, was not an overt act in furtherance of the conspiracy, any of his co-conspirators' acts in furtherance of the conspiracy, on or after April 8, 1997, brought his conspiracy charge within the statute of limitations.

47

As for the count of corruptly endeavoring to interfere with the administration of internal revenue laws, the statute of limitations began to run "on the date of the last corrupt act," Wilson, 118 F.3d at 236, so the government was required to prove beyond a reasonable doubt that James Thompson committed a corrupt act on or after April 8, 1997. The district court correctly instructed the jury on this issue, and, for reasons similar to those supporting the conspiracy count, a reasonable jury could have found that James Thompson's telephone message was a corrupt act designed to obstruct or impede the IRS investigation.

*Summary charts*

Thomas and Leslie Mower both contend that the district court abused its discretion and committed reversible error in admitting the government's "summary charts." Neither of the defendants specifies which particular "summary charts" they are challenging. At a minimum, it appears both defendants are appealing the district court's decision to admit Exhibit 80-3. Some of their argument also appears to challenge the district court's admission of other exhibits.

Regardless of which summary charts the Mowers are appealing, the district court did not abuse its discretion in admitting them. Under the Federal Rules of Evidence,

> [t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or

48

duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place.  The court may order that they be produced in court.

Fed. R. Evid. 1006.  "The admission of summaries under Rule 1006 is within the sound discretion of the trial court," Harris Mkt. Research v. Marshall Mktg. & Commc'ns, Inc., 948 F.2d 1518, 1525 (10th Cir. 1991), and we review a district court's decision to admit summary charts under Rule 1006 for an abuse of discretion, United States v. Samaniego, 187 F.3d 1222, 1223 (10th Cir. 1999).  In previous cases, we have approved the use of summaries in tax prosecutions, as long as the district court provides appropriate limiting instructions.  See, e.g., United States v. Mann, 884 F.2d 532, 539 (10th Cir. 1989); see also United States v. Ray, 370 F.3d 1039, 1046 (10th Cir. 2004) (explaining that "because tax cases often require the presentation of substantial and complex documentation and the technical analyses of these materials by tax experts," summaries are often admissible in tax cases under Rule 1006), vacated on other grounds, 543 U.S. 1109 (2005).

In the present case, the district court did not err in admitting the summaries.  The government's evidence was incredibly voluminous, and it would have been incomprehensible to the jury without summarization.  Agent Trask compiled the summaries from all of the commission payments that the government alleged were personal income to the Mowers.  Each item listed on the summaries was supported by at least one piece of evidence, such as a check,

49

deposit slip, bank record, or wire transfer receipt.  Exhibit 81-1 listed all of the items in painstaking detail, cross-referencing to each specific exhibit number.

The Mowers are correct that, in compiling the summaries, Agent Trask assumed the items listed were personal income to the Mowers.  She believed, however, that this assumption was factually correct, and she explained how the evidence supported it.  Further, the Mowers thoroughly cross-examined Agent Trask concerning the amounts and items listed on the summaries.  Moreover, as discussed previously, the evidence supported Agent Trask's contention that these amounts were personal income to the Mowers—even the checks that were never negotiated or were deposited in corporate accounts.  Finally, the district court instructed the jury:

> Charts or summaries have been prepared by the government and shown to you during the trial for the purpose of explaining facts that are allegedly contained in books, records, and other documents which are in evidence in the case.  Such charts or summaries are not evidence in this trial or proof of any fact.  If you find that these charts or summaries to [sic] not correctly reflect facts or figures shown by the evidence in the case, the jury should disregard the charts or summaries.
>
> In other words, such charts or summaries are used only as a matter of convenience for you and to the extent that you find they are not, in truth, accurate summaries of facts or figures shown by the evidence in the case, you can disregard them entirely.

Jury Instruction No. 14, ROA, Vol. V, Doc. 188, at 15.  These instructions were sufficient to mitigate any potential prejudice resulting from the admission of the summaries here.  See United States v. Francis, 131 F.3d 1452, 1458 (11th Cir.

50

1997).  The district court did not abuse its discretion in admitting the summaries.

*Grand jury testimony of Allen Davis*

Thomas Mower contends that the grand jury testimony of his attorney, Allen Davis, on March 13, 2002, did not provide *prima facie* evidence that Thomas Mower used Mr. Davis to further a crime or fraud, and the district court erred in granting the government's motion to compel Mr. Davis's December 5, 2002, grand jury testimony.  Thomas Mower also argues that the district court violated his procedural due process rights by refusing to unseal the transcript of an *ex parte* motion hearing and refusing to compel the production of the government's evidence.  He contends that these errors require dismissal of the indictment.

After entering into an immunity agreement with Allen Davis on March 12, 2002, the government subpoenaed Mr. Davis to testify before the grand jury on March 13, 2002.  Mr. Davis, an attorney at Neways US, began by explaining that he was representing Thomas Mower individually during the IRS investigation.  Mr. Davis testified that he met with Thomas Mower, prior to the interview with Agent Elder, to discuss the IRS investigation, but Mr. Davis asserted attorney-client privilege in response to questions about the content of that meeting.  He then identified the loan document for Hobble Creek, and stated that he was present when James Thompson created it, that he was present when it was provided to Agent Elder, and that the Mowers later permitted him to tell Agent

51

Elder that it was a false loan document. He asserted attorney-client privilege, however, in refusing to answer a question about whether he ever had a meeting with Thomas Mower in which they discussed the Hobble Creek loan document. Later, he testified that, after the IRS investigation began, they originally decided to amend the Mowers' individual income tax returns, but Thomas Mower decided not to file them and instead to amend the Neways US corporate returns. Mr. Davis further testified that he talked with Michael Cunningham about the payments from Australia, but he again asserted attorney-client privilege regarding his conversations with Thomas Mower on that subject.

Following Mr. Davis's grand jury testimony, the government filed an *ex parte* motion to compel the testimony of Mr. Davis and two other attorneys. The district court granted the motion, finding:

A.    The government has established a prima facie showing that the alleged crime has some foundation in fact;

B.    The government has sustained their burden of showing that the testimony sought is related to the charges under investigation; and

C.    The testimony sought is not covered by the attorney-client privilege because the purported conversations and documents were in furtherance of a crime or fraud[.]

Order to Compel, T.M. Opening Br. at App'x C, at 1. The district court ordered Mr. Davis and the two attorneys

to testify before the grand jury to answer questions regarding Thomas Mower and Leslie Mower's failure to report on their U.S. individual

52

income tax return or a U.S. corporate income tax return their commission income earned from Neways U.S., Neways Australia, Neways Malaysia and other Neways entities from 1989 through the present, the preparation of phoney loan documents, the presentation of phoney loan documents to the IRS, the preparation and filing of the Mower's individual income tax returns, the preparation and filing of Neways corporate tax returns, the preparation and filing of Mower Properties tax returns, the preparation and filing of amendments to Neways corporate tax returns, falsification of Neways U.S. and Mower Properties' corporate books and records and other attempts by these attorneys to knowingly or unwittingly further Thomas Mower and Leslie Mower's tax fraud scheme.

Id. at 1-2. Under compulsion from the order, Allen Davis again appeared before the grand jury on December 5, 2002, and provided answers to questions on the subjects identified in the court's order. In response, Thomas Mower filed a motion to unseal the transcript of the *ex parte* hearing and to compel the production of the evidence that the government provided to the district court in connection with the hearing. The district court denied this motion. Later, Thomas Mower filed a motion to dismiss the indictment, contending that the government's intrusion into his attorney-client privilege violated his due process rights. The district court denied this motion as well.

We conclude that Thomas Mower's contentions on appeal do not support dismissal of the indictment. As for his first contention—that the order to compel was unjustified and over-broad under the crime-fraud exception to attorney-client privilege—presumably he is claiming a violation of his due process rights, although it is not entirely clear from his discussion. "We review the denial of

53

Appellant's motion to dismiss the indictment for an abuse of discretion." United

States v. Kingston, 971 F.2d 481, 490 (10th Cir. 1992). In United States v.

Kennedy, 225 F.3d 1187, 1194 (10th Cir. 2000), we explained that, although

"[g]overnment intrusions into pre-indictment attorney-client relationships do not

implicate the Sixth Amendment,"[14] there are instances in which "a defendant may

claim his or her rights under the Due Process Clause have been violated by

prosecutorial misconduct occurring prior to indictment." Such a violation only

occurs where the "[m]isconduct by law enforcement officials in collecting

incriminating evidence . . . is outrageous enough to shock the conscience of the

court." Id. (citing Rochin v. California, 342 U.S. 165, 172-74 (1952)). After

noting that "[o]ther courts have concluded governmental misconduct in the form

of a pre-indictment invasion of a defendant's attorney-client relationship may,

under some circumstances, amount to a deprivation of the defendant's right to due

process," we adopted the Third Circuit's test for evaluating such claims:

> [I]n order to raise a colorable claim of outrageousness pertaining to
> alleged governmental intrusion into the attorney-client relationship,
> the defendant's submissions must demonstrate an issue of fact as to
> each of the three following elements: (1) the government's objective
> awareness of an ongoing, personal attorney-client relationship
> between its informant and the defendant; (2) deliberate intrusion into

---

[14] Thus, Thomas Mower is incorrect in claiming that the government's conduct, pre-indictment, violated his Sixth Amendment right to counsel. Kingston, 971 F.2d at 491 ("Because the Sixth Amendment right to counsel does not attach prior to indictment, Appellant cannot show that he was prejudiced by a Sixth Amendment violation on these facts." (citation omitted)).

54

that relationship; and (3) actual and substantial prejudice.

Id. at 1195 (quoting United States v. Voigt, 89 F.3d 1050, 1067 (3d Cir. 1996)).

Thomas Mower has failed to show that the challenged government conduct—"[t]he government's *ex parte* invocation of the crime/fraud exception to defendant's attorney-client privilege," T.M. Opening Br. at 40—caused him any actual and substantial prejudice under the third prong of the Kennedy test. In his brief on appeal, Thomas Mower states:

> Among the more damaging disclosures was the disclosure that amended personal tax returns reporting the foreign commissions as the Mowers' personal income had been prepared but never filed. Although those returns were not filed, and the commissions were reported as corporate income instead, the government used the fact that, in a privileged setting, the Mowers and their advisors had first characterized the income as personal to persuade the jury that the later characterization of the income was fraudulent.

T.M. Opening Br. at 43. Contrary to Thomas Mower's contention, this "damaging disclosure" did not occur during Allen Davis's December 5, 2002, grand jury testimony as a result of the district court's order to compel. Rather, Mr. Davis discussed these facts in his previous grand jury testimony on March 13, 2002, prior to the government ever seeking the order to compel. Mr. Davis certainly testified about this point on December 5, 2002, but, given his previous testimony, the later testimony hardly qualifies as a "damaging disclosure." Under the third prong of the Kennedy test, Thomas Mower has not shown any "actual and substantial prejudice" resulting from the district court's order to compel—or

55

from "[t]he government's *ex parte* invocation of the crime/fraud exception to defendant's attorney-client privilege"—and there was no deprivation of his due process rights. See Kennedy, 225 F.3d at 1195-97.[15] As a result, we do not need to address whether attorney-client privilege, or the crime-fraud exception to that privilege, appropriately applied to Mr. Davis's testimony. See Kingston, 971 F.2d at 491 n.5 ("It is unclear whether, in fact, a breach of the attorney-client privilege occurred during the grand jury proceedings. . . . We need not reach th[is] issue . . . because, as stated in the text, Appellant has failed to show prejudice stemming from this alleged violation of the attorney-client privilege.").

Thomas Mower's second contention—that the district court's refusal to unseal the transcript of the *ex parte* hearing and compel the production of the government's evidence violated his procedural due process rights—is likewise unpersuasive. Given the procedural posture of the case, this second contention falls within our due process analysis under the Kennedy test, and, as explained above, Thomas Mower has failed to show any "actual and substantial prejudice" under that test. Kennedy, 225 F.3d at 1195.

---

[15] The disclosure of the draft amended individual income tax returns appears to be the only "damaging disclosure" that Thomas Mower alleges here. Perhaps the language of his brief can be interpreted as contending that other "disclosures" by Mr. Davis on December 5, 2002, were prejudicial, see T.M. Opening Br. at 43 ("Among the more damaging disclosures . . . ." (emphasis added)), but without any additional specificity, it would be difficult—if not impossible—for us to determine whether any "actual and substantial prejudice" resulted from these "damaging disclosures."

*Severance*

Both Leslie Mower and James Thompson challenge the district court's decision to deny their respective motions for severance. Leslie Mower argues that, because of the "overwhelming evidence" at trial against Thomas Mower and James Thompson, it was impossible for the jury to consider only the evidence against her. Likewise, James Thompson argues that he was prejudiced by the great weight of the evidence against the Mowers—especially considering his comparatively brief participation in the alleged conspiracy and the fact that, on multiple days during the trial, he was never even mentioned.

The district court did not abuse its discretion in denying Leslie Mower's or James Thompson's motion to sever. Under Rule 8(b) of the Federal Rules of Criminal Procedure, a single indictment may charge multiple defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Even if multiple defendants have been charged together in a single indictment, though, the district court may sever their trials: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). "The granting of a motion to sever is ordinarily left to the district court's discretion." United States v. Powell, 982 F.2d 1422, 1432 (10th Cir.

1992).  "Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party is sufficient to warrant severance."  United States v. Hack, 782 F.2d 862, 870-71 (10th Cir. 1986) (citations omitted).  Rather, "absent a showing of clear prejudice, a joint trial of the defendants who are charged with a single conspiracy in the same indictment is favored where proof of the charge is predicated upon the same evidence and alleged acts."  Id. at 871.

Like Thomas Mower, Leslie Mower and James Thompson were charged with conspiracy to defraud the United States, and generally, "in a conspiracy trial it is preferred that persons charged together be tried together."  United States v. Scott, 37 F.3d 1564, 1579 (10th Cir. 1994).  As previously discussed, there was more than enough evidence to implicate both Leslie Mower and James Thompson in the conspiracy.  They were both active participants in the conspiracy, and even if James Thompson's participation in the conspiracy was comparatively brief, he created the false loan document and assisted in concealing the Mowers' income.  The evidence against each defendant—not any "spillover effect" of evidence against others—provided a sufficient and independent basis for the conviction of both Leslie Mower and James Thompson.

In addition, the district court instructed the jury that

[e]ach defendant is entitled to have his or her case decided solely on

58

the evidence which applies to him or her. . . . You must give separate and individual consideration to each charge against each defendant. The fact that you find one defendant guilty or not guilty of the crimes charged in the Indictment should not control your verdict as to whether you find the other defendant guilty or not guilty of the crimes charged in the Indictment. You must consider the evidence presented and determine whether the government has proved, beyond a reasonable doubt, its case against each of the defendants.

Jury Instruction No. 18, ROA, Vol. V, Doc. 188, at 19; see also Jury Instruction No. 21, id. at 22. These instructions cured any potential prejudice that could have resulted from a joint trial. See Zafiro v. United States, 506 U.S. 534, 540-41 (1993) ("Moreover, even if there were some risk of prejudice, here it is of the type that can be cured with proper instructions, and juries are presumed to follow their instructions." (citation and internal quotation marks omitted)). The district court did not abuse its discretion by denying the motion for severance.

*Jury instructions*

Leslie Mower appeals three issues with regard to the district court's jury instructions. She argues that the district court erred in (1) refusing to give a requested instruction explaining the difference between corporate and personal income; (2) refusing to give a requested instruction on the Mowers' theory of defense; and (3) not providing an instruction allowing the jury to consider the lesser-included offense of misdemeanor tax evasion.

59

A.    *Jury instruction distinguishing personal from corporate income*

The defendants proposed a jury instruction explaining the difference between personal and corporate income.  At the jury instruction conference, the district court accepted most of the proposed instruction, including the following paragraphs:

> The first step in arriving at taxable income is to determine the individual taxpayers' gross income. . . .
>
> In determining whether the income is personal to the defendants, you may consider several factors, including whether the defendants actually received the money, how the money was used, the intent of the parties as determined by all of the circumstances, the economic realities, and the substance and the form of the transaction.

Jury Instruction No. 31, ROA, Vol. V, Doc. 188, at 34.  The district court, however, refused to include an additional paragraph that the defendants had proposed as part of this instruction.  This paragraph stated:

> However, the fact that a defendant owns a corporation and makes decisions regarding corporate monies does not mean that the corporation's income is taxable to him or her personally because, by definition, the owner of a corporation always has control over corporate monies.

L.M. Opening Br. at 34 n.12.[16]  Leslie Mower's counsel, Neil Kaplan, acquiesced in this final jury instruction:

THE COURT:      We're going to replace 35 and 36 with the
                Mowers' proposal, with the third paragraph

---

[16] Although the text of the supposed instruction is not in the record on appeal, the parties appear to agree on its content.

> deleted. And then, in the second paragraph, the phrase between the comma "rather than to their corporations," that's out.

MR. KAPLAN: We're fine. . . .

Jury Instruction Conference, ROA, Vol. XXV, at 28-29.

Because Leslie Mower agreed to the final language of Jury Instruction No. 31, we review for plain error. See United States v. Robertson, 473 F.3d 1289, 1291 (10th Cir. 2007). "Plain error exists only where (1) there was error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. Here, the district court did not err in refusing to include the defendants' proposed paragraph, so the first prong of our plain error standard disposes of Leslie Mower's argument. The language that ultimately appeared in Jury Instruction No. 31 was more than adequate to instruct the jury on the difference between corporate and personal income. The omitted language, in contrast, could have created confusion for the jury because it overemphasized the amount of control an owner of a corporation appropriately exercises over corporate monies. The omitted language also failed to account for the law regarding constructive dividends—where the amounts are ultimately taxed twice, as both corporate and shareholder income. See, e.g., Wortham Mach. Co. v. United States, 521 F.2d 160, 164 (10th Cir. 1975). The district court appropriately refused to include this language. See United States v. Kaatz, 705 F.2d 1237, 1246 (10th Cir. 1983)

61

("The instructions must be reviewed as a whole. The requested instruction would have added nothing but confusion and was properly refused." (citation omitted)).

B. *Jury instruction regarding defendants' theory of defense*

The defendants also proposed a jury instruction regarding their theory of defense. This proposed instruction stated:

> As to Counts Two through Seven, if you have a reasonable doubt as to whether . . . Leslie D. Mower willfully failed to report income . . . she knew was personal income because . . . Leslie D. Mower believed:
>
> > 1. the monies were income or a loan to a corporation;
> >
> > 2. the monies were repayment of loans;
> >
> > 3. that taxes on the monies had been withheld and paid;
> >
> > 4. that for any other reason the monies were not taxable to [the Mowers] personally,
>
> then you must find . . . Leslie D. Mower not guilty, even if you also have some question that additional taxes may still be due.

Theory of Defense Instruction, ROA, Vol. V, Doc. 186, at 4.[17] The district court refused to include this instruction.

"Criminal defendants are entitled to jury instructions upon their theory of defense provided there is evidentiary and legal support. Upon the failure to so instruct, we will find reversible error." United States v. Visinaiz, 428 F.3d 1300,

_____

[17] Again, Leslie Mower cites to an exhibit to Doc. 187, which is not in the record. The government, however, cites to Doc. 186, which is in the record and appears to include the exact same language.

1308 (10th Cir. 2005) (citation omitted). The district court, however, is not required to give a theory of the defense instruction "if it would simply give the jury a clearer understanding of the issues." United States v. Wolny, 133 F.3d 758, 765 (10th Cir. 1998). Rather, the district court is only required to give the instruction "if, without the instruction, the district court's instructions were erroneous or inadequate." Id. "We review the instructions de novo to determine whether, as a whole, they adequately apprised the jury of the issues and the governing law." Id.

Here, the district court's instructions "adequately apprised the jury of the issues and the governing law" regarding willfulness, and the rejected jury instruction was unnecessary. Id. For instance, the district court instructed the jury that "a failure to report income on a tax return, without willfulness, is not sufficient to satisfy the requirement of an affirmative act of evasion." Jury Instruction No. 32, ROA, Vol. V, Doc. 188, at 35. Another jury instruction provided:

> The word "willfully," as used in this tax statute means a voluntary, intentional violation of a known legal duty. In other words, the defendant must have acted voluntarily and intentionally and with the specific intent to do something the law forbids; that is to say, with a purpose either to disobey or to disregard the law. . . . [N]egligent conduct, even grossly negligent conduct, a mistake, misunderstanding, and/or a good faith belief, even if unreasonable, is not sufficient to constitute willfulness.

Jury Instruction No. 33, id. at 36. In light of these jury instructions, the district

63

court was not required to give Leslie Mower's proposed theory of the defense instruction, which was "essentially [a] summar[y] of the evidence in the light most favorable to the defense, [a] summar[y] that [was] more appropriate for closing argument." Wolny, 133 F.3d at 766 (citations, alteration, and internal quotation marks omitted).

C.       *Lesser-included offense instruction*

Leslie Mower argues that the district court erred in not providing a lesser-included offense instruction for misdemeanor tax evasion.[18]  She admits that she did not request this instruction before the district court.  Therefore, as we have explained in a previous case, she may not be entitled to any appellate review—even for plain error: "'[T]his court has often held in noncapital cases involving direct appeals that a trial court does not err in refusing to give a lesser included instruction—even one supported by the evidence—if the defendant neglects to make a proper request for one at trial.'"  United States v. Bruce, 458 F.3d 1157, 1164 n.3 (10th Cir. 2006) (quoting Hooks v. Ward, 184 F.3d 1206, 1234-35 (10th Cir. 1999)).  Nevertheless, in Bruce, 458 F.3d at 1164 & n.3, we noted that we had "occasionally applied plain error review in contexts similar to that at issue in this case," and, given the facts in that case, we did not "definitively decide the issue because Bruce's claim fails even assuming plain

---

[18] She never actually specifies which crime she is referencing, but presumably it is 26 U.S.C. § 7203.  The government assumes as much in its brief.

error review is applicable when a defendant fails to make a proper request for a lesser-included-offense instruction."

Likewise, even if we review Leslie Mower's claim under our plain error standard, it fails. Like the court in Bruce, 458 F.3d at 1164-66, we need only address the fourth prong of the plain error test, because Leslie Mower has not shown any error "that seriously affects the fairness, integrity or public reputation of judicial proceedings." "Under this standard, 'we will not notice a non-constitutional error, such as the one in the case before us, unless it is both particularly egregious and our failure to notice the error would result in a miscarriage of justice.'" Id. at 1165 (quoting United States v. Gonzalez-Huerta, 403 F.3d 727, 736 (10th Cir. 2005) (en banc)). Leslie Mower has the burden of meeting this standard. Id. As discussed previously, there was more than enough evidence to support Leslie Mower's conviction of tax evasion under 26 U.S.C. § 7201, and Leslie Mower has not shown that a "miscarriage of justice" resulted from the district court's failure to instruct on the lesser-included offense of misdemeanor tax evasion. Accord Bruce, 458 F.3d at 1165 ("Despite Bruce's protestations to the contrary, the government's case against him was strong.").

*Leslie Mower's sentencing*

Leslie Mower appeals several issues with regard to her sentencing. She argues that (1) her sentence was procedurally unreasonable because the district court incorrectly calculated her tax loss and applied the Guidelines as mandatory;

65

(2) her sentence was substantively unreasonable under the factors listed in 18 U.S.C. § 3553(a); and (3) the application of the 2005 Guidelines violated the *ex post facto* clause of the Constitution.

"When reviewing a sentencing challenge, we evaluate sentences imposed by the district court for reasonableness." United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007) (citing United States v. Booker, 543 U.S. 220 (2005); United States v. Kristl, 437 F.3d 1050, 1053 (10th Cir. 2006)); see also Gall v. United States, --- U.S. ---, 128 S. Ct. 586, 594 (2007) ("[A]ppellate review of sentencing decisions is limited to determining whether they are 'reasonable.'"). This inquiry includes both procedural and substantive components, and we "review the sentence under an abuse-of-discretion standard." Gall, 128 S. Ct. at 597. "Procedural reasonableness involves using the proper method to calculate the sentence. Substantive reasonableness involves whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." Conlan, 500 F.3d at 1169 (citations omitted).

A. *Procedural reasonableness*

1. *Tax loss calculation*

Leslie Mower challenges the procedural reasonableness of the district court's tax loss findings. First, she argues that the district court erred in failing to apportion its tax loss findings by year. It does not appear that she raised this

66

issue before the district court, so we review for plain error. See Robertson, 473 F.3d at 1291.

The district court did not err in failing to apportion its tax loss findings by year, and Leslie Mower's claim fails under the first prong of our plain error test. See id. Under the Guidelines, the district court was required to determine Leslie Mower's base offense level by calculating her tax loss and comparing it to the tax loss table in U.S.S.G. § 2T4.1. See U.S.S.G. § 2T1.1(a)(1). For an offense involving tax evasion, "the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)." Id. § 2T1.1(c)(1). In addition, where "a defendant [was] convicted of more than one count," and the "counts involv[ed] substantially the same harm," the district court is required to group the counts together and determine "the offense level corresponding to the aggregated quantity." Id. §§ 3D1.1(a)(1), 3D1.2(d) (citing § 2T1.1), 3D1.3(b). The district court, therefore, appropriately grouped the counts against Leslie Mower and calculated her offense level based upon "the aggregated quantity" of the tax loss. Id. § 3D1.3(b).

There is also no support for Leslie Mower's argument that, because Thomas Mower was convicted of tax evasion for the same amounts, the district court was required to reduce her tax loss by fifty percent in calculating her base offense level. Section 1B1.3(a)(1) of the Guidelines explains that

the base level offense . . . shall be determined on the basis of the

67

following: . . .

(B)     in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

See also United States v. Bishop, 291 F.3d 1100, 1115 (9th Cir. 2002) ("Because the defendants were convicted of conspiring to defraud the IRS, the total tax loss, including the loss through the spouses, is attributable to each defendant. Tax loss is determined from the reasonably foreseeable conduct of all co-actors, not just the defendant's own conduct." (citation omitted)).  Given this standard, it is far more likely that the district court erred in not including the Hobble Creek transaction, or all of the money from the Rezults account, in Leslie Mower's tax loss calculations than it is that the district court erred in not reducing her tax loss by fifty percent.

The district court did commit one procedural error, but it was harmless.  In its tax loss findings, the district court stated that it was applying the 2005 Guidelines.  At sentencing, though, the district court actually applied the 2001 Guidelines.  As will be discussed, the district court was correct in applying the 2001 Guidelines.  Under the "one-book rule" of the Guidelines, however, the

68

district court erred in using sections from two different versions of the Guidelines. See U.S.S.G. § 1B1.11(b)(2). Nevertheless, the provision that the district court cites in its tax loss findings—the tax loss table in U.S.S.G. § 2T4.1—is the same in the 2001 Guidelines as it is in the 2005 Guidelines for calculating Leslie's Mower's base offense level. Compare U.S.S.G. § 2T4.1 (2005), with U.S.S.G. § 2T4.1 (2001). In addition, the sentencing table in both sets of Guidelines is the same with regard to Leslie Mower, who had a total offense level of 18 and a criminal history category of I. Compare U.S.S.G. ch. 5, pt. A (2005), with U.S.S.G. ch. 5, pt. A (2001). Any error was harmless.

2.    *Application of the Guidelines*

Leslie Mower argues that the district court violated Booker by applying the Guidelines in a mandatory fashion, and therefore, her sentence was procedurally unreasonable. Under the Supreme Court's decision in Booker, 543 U.S. at 226-27, 245, the Guidelines are advisory, and the district court may not apply them in a mandatory fashion. Because Leslie Mower did not object to this alleged sentencing error before the district court, we review for plain error. See United States v. Begay, 470 F.3d 964, 976 (10th Cir. 2006); see also Booker, 543 U.S. at 268 ("[W]e expect reviewing courts to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test.").

The district court did not apply the Guidelines in a mandatory fashion, and

69

Leslie Mower's claim fails under the first prong of our plain error test. Leslie Mower relies on two statements by the district court as evidence that it applied the Guidelines in a mandatory fashion. The first is the district court's statement at sentencing, in response to her contention that her disabled son needed her at home:

> I am troubled by the relationship matter, but the law is so -- presumptions are so much against family problems to be taken into consideration. You know, about one case out of three has something like this, and the law has just developed steadily presumptively against it and the presumption is that somehow arrangements can be made. So as I said a minute ago, the 3553 factors lead me still to a low end guideline sentence here without leading role applying.

L.M. Sentencing, ROA, Vol. XXIX, Doc. 350, at 23. This statement does not show that the district court viewed the Guidelines as mandatory. Rather, the district court is simply acknowledging that defendants often cite their family responsibilities as a reason for imposing lighter sentences, and the law generally discourages district courts from taking this into account. See United States v. Hildreth, 485 F.3d 1120, 1129 (10th Cir. 2007) ("[I]ndeed, as a matter of policy, the Guidelines discourage courts from considering family ties and responsibilities in sentencing decisions." (citing U.S.S.G. § 5H1.6)).

The second statement came in response to Leslie Mower's request on February 26, 2007, that the district court "recommend to the Bureau of Prisons that she be placed in a Community Correctional Facility pursuant to the factors set forth in 18 U.S.C. § 3621(b)." Doc. 354, at 2 (citing Wedelstedt v. Wiley, 477

70

F.3d 1160 (10th Cir. 2007)).  The district court responded with the following:

> Defendant's current back problems have arisen since sentencing. Although the court will not affirmatively recommend placement in a community correctional center, the court would not oppose [her] placement in a community correctional center.  Her current health problems and the fact that such a placement would afford her increased access to her treating physicians certainly weigh in favor of such a placement.  She also poses no threat to the community.

02/28/07 Order, Doc. 360, at 2.  This statement does not show that the district court viewed the Guidelines as mandatory.  Indeed, this statement came months after sentencing, and even then, the district court did not indicate that it felt in any way constrained by the Guidelines.  See id.  Instead, the district court appropriately examined her circumstances and decided not to "recommend placement in a community correctional facility."  Id.

In addition, the district court explained at sentencing that it had applied the sentencing factors under 18 U.S.C. § 3553(a).  See L.M. Sentencing, ROA, Vol. XXIX, Doc. 350, at 23 ("[T]he 3553 factors lead me still to a low end guideline sentence here . . . .").  Given this explanation, and the lack of any evidence that the district court viewed the Guidelines as mandatory, Leslie Mower's sentence was procedurally reasonable.[19]

---

[19] In a separate section of her brief on appeal, Leslie Mower argues that the district court violated United States v. Booker, 543 U.S. 220 (2005).  This appears to be a restatement of her argument that the district court applied the Guidelines in a mandatory fashion.

B.      *Substantive reasonableness*

As the Supreme Court recently explained in <u>Kimbrough v. United States</u>, --- U.S. ---, 128 S. Ct. 558, 564 (2007), "'reasonableness' is the standard controlling appellate review of the sentences district courts impose." We review for substantive reasonableness "under an abuse-of-discretion standard," and, "[w]hen conducting this review, [we] will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." <u>Gall</u>, 128 S. Ct. at 597. Moreover, we may apply a presumption of reasonableness to a sentence properly calculated under the Guidelines. <u>Id.</u> "'The defendant may rebut this presumption by demonstrating that the sentence is unreasonable in light of the other sentencing factors laid out in [18 U.S.C.] § 3553(a).'" <u>United States v. Arrevalo-Olvera</u>, 495 F.3d 1211, 1213 (10th Cir. 2007) (quoting <u>Kristl</u>, 437 F.3d at 1055) (alteration in original).

Under the district court's tax loss findings, Leslie Mower's sentence was within the Guidelines range, and we accord it a presumption of reasonableness. <u>Id.</u> Leslie Mower has failed to demonstrate that the sentence is unreasonable in light of the factors listed in 18 U.S.C. § 3553(a). We therefore hold that the district court did not abuse its discretion, and we affirm her sentence as substantively reasonable.

C.      *Leslie Mower's sentence under the* ex post facto *clause*

Leslie Mower argues that the district court violated the *ex post facto* clause,

U.S. Const., art. I, § 9, cl. 3, by sentencing her under the 2005 Guidelines, rather than the 1989 Guidelines.  She concedes that she did not object to the district court on this ground, so our review is only for plain error.

The district court did not err here, and, as a result, Leslie Mower's *ex post facto* claim fails under the first prong of our plain error test.  See Robertson, 473 F.3d at 1291.  "A sentencing court is generally required to apply the Guidelines that are in effect on the date the defendant is sentenced."  United States v. Gerber, 24 F.3d 93, 95 (10th Cir. 1994); see also 18 U.S.C. § 3553(a)(4)(A)(ii); U.S.S.G. § 1B1.11(a).  However, the *ex post facto* clause "bars the sentencing court from retroactively applying an amended guideline provision when that amendment disadvantages the defendant."  Gerber, 24 F.3d at 95-96 (citation and internal quotation marks omitted).  To determine whether the application of a version of the Guidelines violates the *ex post facto* clause, we use a two-prong test: "first, did the sentencing court apply the guideline to events occurring before its enactment, and second, did that guideline disadvantage the offender affected by it."  Id. at 96 (citations and internal quotation marks omitted).

In the instant case, the district court correctly applied the 2001 version of the Guidelines in sentencing Leslie Mower.[20]  The district court explained:

---

[20] As discussed above, the district court did err in applying the 2005 Guidelines in calculating Leslie Mower's tax loss, but because the 2005 Guidelines were the same as the 2001 Guidelines in this regard, such error was

(continued...)

73

I think the evidence is that there were overt acts after 2001. I don't think that's inconsistent with the loss findings. So I'm going to apply the 2001 guidelines.

T.M. Sentencing, ROA, Vol. XXIX, Doc. 325, at 18; see also L.M. Sentencing, ROA, Vol. XXIX, Doc. 350, at 7 (same rationale applies). The district court was correct that the evidence showed overt acts (for conspiracy) and affirmative acts of evasion (for the six counts of tax evasion) that occurred after 2001. Given that all of her offenses continued after the date on which the 2001 Guidelines became effective, the district court did not violate the *ex post facto* clause by applying the 2001 Guidelines at her sentencing. See United States v. Sullivan, 255 F.3d 1256, 1259 (10th Cir. 2001) ("Because the defendant completed the second offense after the amendment to the guidelines took effect, the *ex post facto* clause does not prevent determining the sentence for that count based on the amended guidelines." (quoting U.S.S.G. § 1B1.11 cmt. background)); cf. U.S.S.G. § 1B1.11(b)(1) (explaining that, if the *ex post facto* clause would otherwise be violated, "the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed").

---

[20](...continued)
harmless. For similar reasons, this did not "disadvantage" Leslie Mower for the purposes of our *ex post facto* clause analysis.

74

## III.

The convictions and sentences of Thomas Mower, Leslie Mower, and James Thompson are AFFIRMED.